IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHERICE ANDERSON, | ) |
| | ) |
| Plaintiff, | ) Case No.: 08 C 4917 |
| | ) |
| vs. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) Magistrate Judge Arlander Keys |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sherice Anderson, moves this Court for Summary

Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil

Procedure, to reverse or remand the final decision of the

Commissioner of the Social Security Administration (the

"Commissioner"), who denied her claim for Disability Insurance

Benefits ("DIB") (42 U.S.C. § 401 et seq. (West 2007)). Ms.

Anderson seeks retroactive and prospective benefits, as well as

attorney's fees. In the alternative, Ms. Anderson seeks an order

reversing and remanding the case for another hearing. The

Commissioner has filed a cross motion for summary judgment,

seeking an order affirming his final determination. For the

reasons set forth below, Ms. Anderson's motion for Summary

Judgment is denied, and the Commissioner's motion for summary

judgment is granted.

## PROCEDURAL HISTORY

On August 5, 2004, Ms. Anderson protectively filed an application for DIB, alleging a disability beginning September 21, 2004. (R. at 50.) She alleged that she suffered from a broken right ankle requiring the use of an assistive device; gastroesophageal reflux disease (GERD); a somatic dysfunction; high blood pressure; blood imbalances; vertigo; vestibular neuronitis; a small pituitary cyst; a congenitally small left vertebral artery; migraines; pain and mood disorders resulting from her general medical condition; and depression. (R. at 6.) Her claim was denied on March 164, 2006. (R. at 58.) On March 24, 2006, Ms. Anderson filed a Request for Reconsideration (R. at 64). On June 9, 2006, the denial of the claim was affirmed. (R. at 340.) On October 24, 2006, Ms. Anderson requested a hearing before an Administrative Law Judge ("ALJ"), after informally requesting a hearing on July 26, 2006. (R. at 74.)

A hearing was held on October 23, 2007, before ALJ Denise McDuffie Martin in Orland Park, Illinois. (R. at 75-8.) Following the hearing, the ALJ issued an unfavorable decision on March 6, 2008, finding that Ms. Anderson was not disabled within the meaning of the Social Security Act. (R. at 57.) Ms. Anderson filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on April 9,

2008. (R. at 6). On July 2, 2008, the Appeals Council denied the request for review, making the ALJ's March 6, 2008 decision the final administrative determination of the Commissioner. (R. at 1.)

On August 27, 2008, Ms. Anderson filed a complaint in the United States District Court for the Northern District of Illinois, seeking review of the final agency determination. The parties consented to proceed before a United States Magistrate Judge, and, on December 23, 2008, the case was reassigned to this Court. On February 9, 2009, Ms. Anderson filed a Motion for Summary Judgment; the Commissioner filed his crossmotion on March 11, 2009, and Ms. Anderson filed a reply brief on March 25, 2009.

## FACTUAL HISTORY

### A. Hearing of October 23, 2007

At the hearing on October 23, 2007, the ALJ heard from Ms. Anderson, a medical expert, and a vocational expert.

#### 1. Ms. Anderson's Testimony

##### Personal History and Report of Daily Activities

Ms. Anderson testified that she was 31 years old and had a bachelor's degree. (Tr. at 17-18.) She testified that she was the mother of four children, ranging from four to eleven years old. (Tr. at 17.) Ms. Anderson stated that she did not go to many of her children's school events and did not attend functions

3

with family or friends, did not go to church, did not have any hobbies, did not do gardening or yard work, and did not read. (Tr. at 18.) She testified that she watched television, but sometimes had trouble following the storyline. (Tr. at 18-19.) Ms. Anderson stated that she lived with her husband, mother, brother, and father. (Tr. at 17.)

Ms. Anderson testified that she did not take care of her children. (R. at 24.) She stated that she drove a car only once every two or three weeks, and that when she did drive, she would "forget sometimes . . . the littlest things, [for instance] to stop [at the intersection]." (*Id.*) She testified that she did not perform household chores, wash laundry, cook, make the beds, or take out the garbage. (R. at 25.)

When questioned about her daily routine, Ms. Anderson testified that she slept each day from 10:00 until 12:30, at which time she walked down the street to pick up her son from school, and the two of them would then lay down until about 2:30. (R. 26.) She testified that, after 2:30, she would help her children with homework, and she would go to bed by 9:30. (*Id.*)

With regard to her work history, Ms. Anderson testified that she last worked on approximately September 21, 2004. (R. at 17.) She stated that at that time, she worked part-time for 20 hours a week, but was not able to maintain those 20 hours due to health

4

problems. (R. at 21.) She testified that she could not stand or walk at all during the eight-hour workday, and had no history of doing any lifting on the job. (Tr. at 17.)

Ms. Anderson testified that she worked in customer service, performing receptionist work, from August 1999 to April 2000; that job permitted Ms. Anderson to sit down while at work, and she did not do any lifting. (R. at 39.) Ms. Anderson testified that, from July 2000 to September 2001, she worked as a claims adjuster, where she would sit down while at work and regularly lift files that weighed less than ten pounds; she underwent a month-long training for that job. (R. at 37-38.) Ms. Anderson testified that she was on maternity leave during most of her tenure with that employer, and only worked for a total of approximately four months. (R. at 38.) Ms. Anderson stated that she did work similar to other claims adjusters. (Id.)

Ms. Anderson testified that she worked full-time as an insurance sales agent from September 2001 to January 2002. (R. at 36.) She sat down while working at that job, and she did not do any lifting. (R. at 37.) Because she had previous experience in the insurance field, Ms. Anderson did not need any special training. (Id.)

Ms. Anderson testified that she worked part-time for fifteen hours per week as a tax preparer from January 2004 to March 2004.

(R. at 35-36.) That job required Ms. Anderson to undergo a week of training and she sat down while working. (*Id.*)

Ms. Anderson testified that she most recently worked part-time for twenty hours per week as a realtor assistant. (R. at 36.) That job permitted Ms. Anderson to sit down while working. (*Id.*)

## Mental and Physical Impairments

With regard to her alleged impairments, Ms. Anderson testified that she broke her ankle in a car accident in January 2002, and that, after the accident, she had to relearn how to walk and was dependent on a walker until she gave birth in June 2002. (R. at 18-19.) She testified that she suffered a stroke in 2002 that resulted in a loss of memory and the ability to concentrate. (R. at 17.) She stated that she suffered from a tingling in her hands and feet that lasted approximately 20 minutes and occurred a few times each day. (R. at 18.)

Additionally, Ms. Anderson testified that she could no longer work due to gastritis. (R. at 21.) She stated that she had a hysterectomy in 2006, which she testified caused her to enter early menopause, resulting in irritability, hot flashes, and night sweats. (R. at 22.) She stated that she had trouble sleeping, experienced depression and changeable moods, and suffered from pain in her ankle. (*Id.*) She testified that she

6

suffered from stress and reduced concentration.  (R. at 23.)  She testified that she suffered drowsiness, which she attributed to side effects caused by medications.  (R. at 26.)

2.    Testimony of Dr. Larry Kravitz, Medical Expert

Dr. Larry Kravitz, a psychologist and medical expert (ME), also testified at Ms. Anderson's hearing.  (R. at 29-34.)  The ME testified that Ms. Anderson was diagnosed with major depressive disorder (moderate), based on one appointment.  (R. at 29.)  A consultative evaluation indicated that Ms. Anderson was diagnosed with a pain disorder associated with both medical and psychological features and a mood disorder due to her general medical condition.  (R. at 29-30.)  The ME testified that diagnosing someone with a pain disorder means that the person "is compromised secondary due to a pain disorder, and then the delineation is to what degree it is based on psychological factors as opposed to physical factors or a general medical condition."  (R. at 31.)  The ME stated, "most pain disorders carry with them a psychological component because it's very difficult to be in severe chronic pain and not have it affect your psyche.  . . .  Typical affects are depression, anxiety, [a]tend[ency] to socially withdrawal, [and] a decrease in overall activity level[s]."[1]  (R. at 32.)

--------
[1] The ME also provided testimony defining a somatic dysfunction, stating that it is "when the medical establishment does not have a

7

The ME testified that, in his medical opinion, Ms. Anderson's condition did not meet or equal a listed impairment. (R. at 30.) The ME testified that Ms. Anderson was "capable of understanding, remembering, [and] carrying out short and simple instructions on a consistent basis" and was "capable of [following] detailed instructions, but . . . would have occasional problems in sustaining performance at that level." (R. at 30.) He testified that Ms. Anderson "would have some limitations in her ability to deal with the general public" and, based on her testimony, would occasionally demonstrate "moderate problems with supervisors." (R. at 30-31.) The ME indicated that he "would not put [Ms. Anderson] in an environment with strict production quotas or unpredictable stressors or an environment with high levels of stress." (R. at 31.)

The ME testified that, while he had no reason to doubt Ms. Anderson's testimony that she had suffered some decline in her memory ability, he saw very little evidence of memory impairment demonstrated by Ms. Anderson. (R. at 33.) The ME noted that, according to the record, Ms Anderson's "memory, attention, concentration, fund of knowledge, [and] language . . . [were all] within normal limits." (*Id.*) He also noted other evidence

clear medical etiology for a chronic . . . complaint, and yet the person continues to report suffering from it. Sometimes in the absence of finding the medical etiology, a somatoform disorder is diagnosed." (R. at 32-33.)

indicating that she had no "disturbance in thought processes . .
. and the mental status was essentially intact with [Ms.
Anderson] able to do calculations [with] concentration presented
as intact in mental capacity testing." (R. at 33-34.) The ME
also noted that, in "the testimony [before the ALJ, Ms. Anderson]
was able to give a very detailed account of her personal history
[and] of her medical history." (R. at 34.) Based on these
facts, the ME declined to extend the limitations he had given Ms.
Anderson relating to her mild memory impairment. (Id.)

### 3. Testimony of Cheryl Hoiseth, the Vocational Expert

In addition to the ME and Ms. Anderson, the ALJ heard from
Cheryl Hoiseth, a vocational expert (VE). The VE testified that
Ms. Anderson performed work at the sedentary exertional level
while employed as a sales agent by the insurance company, a job
the VE classified as unskilled. (R. at 39-40.) The VE stated
that Ms. Anderson's employment as a claims adjuster was
semiskilled due to the month-long training required and was also
sedentary. (R. at 40.) The VE testified that the Dictionary of
Occupational Titles classifies Ms. Anderson's receptionist
position as sedentary and semiskilled. (Id.)

The ALJ described to the VE a hypothetical person who
matched Ms. Anderson in age, education level, and past relevant
work experience who was limited to light work. (R. at 40.) The

9

hypothetical person could not climb ladders, ropes, or scaffolds, but could perform an "unskilled, simple routine repetitive type job with occasional contact with supervisors, coworkers, and the public, with no strict production quotas . . . and low stress." (Id.) The VE concluded that such a hypothetical person would not be able to perform any of Ms. Anderson's past work. (Id.) However, the VE testified that there would be available job positions in the national economy that would accommodate the hypothetical person's limitations. (Id.) Specifically, the hypothetical person could be employed in a cleaner/housekeeping position at the light level, of which there were 10,800 jobs in the national economy. (R. at 40-41.) The VE testified that the cleaner/housekeeping position was consistent with positions found in the Dictionary of Occupational Titles. (R. at 41.)

Ms. Anderson's attorney then modified the hypothetical, asking the VE whether the positions she identified would still be available for a person who could not stand or walk for at least two hours in an eight-hour workday. (R. at 41.) The VE testified that these positions would not be available to a person with such a limitation. (Id.) Counsel then asked whether there were any positions available to a person who required a nap for two hours during each work day. (Id.) The VE testified that there were no positions for a person with such a limitation.

(*Id.*) Counsel then asked whether there were positions available if a person were decommissioned one day each week due to migraines. (R. at 41-42.) The VE testified that such a limitation would preclude all employment. (R. at 42.) Counsel asked if there were positions available to a person who could not maintain attention and concentration for extended periods, resulting in an inability to complete a normal workday or work week. (*Id.*) The VE testified that a person would have to be able to be on task at least 80 percent of the time to be employable. (R. at 42-43.) Counsel asked how many workdays a person could miss per month before she would be considered unemployable. (R. at 43.) The VE testified that a person could miss approximately one and a half days per month, and that a person who misses in excess of two days per month would find her job to be in jeopardy. (*Id.*)

After the hearing on October 23, 2007, the ALJ held the record open so that Ms. Anderson could submit additional evidence from her treating physician, Dr. Delossantos. (R. at 43.)

B. Medical Evidence

In addition to the testimony of Ms. Anderson, the ME, and the VE, the ALJ had before her an abundance of medical records. The medical evidence in the record shows that Ms. Anderson has a history of a variety of physical and mental impairments.

### 1. Physical Impairments

The record shows that Ms. Anderson has a history of headaches. On July 23, 2002, Ms. Anderson presented to South Suburban Hospital, complaining of headache and some numbness of the right side of her face and leg, and an MRI was performed. (R. at 268.) Attending physician Dr. Abraham Mathew indicated that the MRI of the brain "showed no intercranial circulatory lesion and no evidence of any stenosis." (*Id.*) A chest x-ray revealed no lesions and a normal cardiac size, while a CT of the brain revealed a small lesion, probably sebaceous, in the occipital region. (*Id.*) A stress echo indicated "no evidence of any reversible ischemia." (R. at 269.) Dr. Mathew noted uncontrolled hypertension and a possible migraine. (R. at 273.) On July 25, 2006, Ms. Anderson underwent an echocardiogram. (R. at 291.) The test report indicated that Ms. Anderson fell in the "[u]pper limits of normal left ventricular wall thicknesses." (R. at 291.) On July 26, 2002, Ms. Anderson submitted to a treadmill stress test. (R. at 286.) The test report indicated that Ms. Anderson sustained an adequate heart rate and blood pressure response to the test, and there was "no clinical or electrocardiographic evidence of exercise provoked myocardial ischemia or arrhythmias." (R. at 287.) On July 26, 2002, Ms. Anderson was discharged in stable condition with improved

symptoms, having been cleared both by Dr. Mathew and by the cardiology department. (R. at 269.)

The record also shows that Ms. Anderson has been diagnosed repeatedly with gastroesophageal reflux disease (GERD). Access Community Health Network assessed Ms. Anderson with an enlarged thyroid and GERD on May 28, 2004. (R. at 230.) Mount Sinai Medical Center confirmed that Ms. Anderson exhibited GERD on June 15, 2004 while indicating, "[the] esophageal gastric junction, stomach and duodenum are normal." (*Id.*) Access Community Health Network performed an upper GI procedure on July 7, 2004, again assessing Ms. Anderson with GERD and esophageal displacement. (R. at 228.) St. James Hospital and Health Centers diagnosed Ms. Anderson with GERD and esophageal displacement on July 21, 2004. (R. at 212.) Attending physician Dr. Brian Fox noted a left sided aortic arch, but noted that "[o]therwise, [there was an] unremarkable contrast enhanced CT examination of the thorax." (*Id.*)

On October 5, 2004, Ms. Anderson presented to St. James Hospital and Health Centers. (R. at 213.) Attending physician Dr. Adrienne Fregia noted a worsening of Ms. Anderson's GERD. (R. at 214.) Ms. Anderson underwent an esophagogastroduodenoscopy procedure, and the postoperative diagnosis was a normal upper endoscopy. (R. at 215.) Dr. Fregia

13

noted that the esophagogastroduodenoscopy returned unremarkable results. (*Id.*)

On November 2, 2004, Ms. Anderson underwent an air contrast upper GI and small bowel follow through at Advocate South Suburban Hospital. (R. at 245-46.)  That test indicated that Ms. Anderson suffered from gastritis, with new epigastric pain. (R. at 246.)  Several episodes of mild reflux occurred, but there was no evidence of a hiatal hernia, esophageal mass, or stricture, and the stomach displayed no evidence of an active ulcer or gastritis change. (*Id.*) Ms. Anderson also underwent an ultrasound of the thyroid, which indicated the thyroid was a normal size and exhibited normal ultrasonic texture. (R. at 245.)  The test did not reveal any nodules. (*Id.*)

On December 3, 2004, Ms. Anderson underwent a nuclear medicine thyroid imaging with multiple uptake at Advocate South Suburban Hospital.  The test results indicated the valves to be in the hypothyroid range, and the scan showed "a normal sized gland with fairly homogeneous uptake." (R. at 245.)

The record also shows that Ms. Anderson was in a car accident in January 2002 and that she sustained a broken ankle as a result. (R. at 193.)  Ms. Anderson had open reduction internal fixation of the right ankle and physical therapy. (*Id.*) Ms. Anderson was irritated by the internal hardware, and a procedure

14

was performed to remove the hardware in approximately 2003.

(*Id.*) On November 10, 2004, Ms. Anderson saw physical therapist Dr. Geoffrey Gentry at St. James Hospital and Health Centers for physical therapy. (R. at 193.) Dr. Gentry noted that Ms. Anderson continued to complain of throbbing pain occurring in the ankle three to four times per week that forced her to rely on the use of a cane or walker. (*Id.*) Dr. Gentry indicated that Ms. Anderson's range of motion in the ankle was within normal limits on all planes, and that Ms. Anderson's scars were mobile and only mildly tender at the lateral border of malleolus on the right ankle. (*Id.*) Dr. Gentry stated that Ms. Anderson had a mild decrease in strength with inversion, dorsiflexion, and eversion of all movements of the right ankle, and her single leg standing static balance on the right ankle was poor. (*Id.*) Dr. Gentry's assessment was that Ms. Anderson suffered pain consistent with right ankle instability and recommended that Ms. Anderson attend physical therapy twice a week for four weeks. (R. at 194.)

On December 6, 2004, Advocate South Suburban Hospital indicated that "post-surgical changes in the right ankle" were visible on radiographs dated October 18, 2004, and suggested that the "surgery could account for the findings on the bone scan"; the rest of the skeleton was unremarkable. (R. at 244.) An MRI of the right ankle conducted at Advocate South Suburban Hospital

15

on October 18, 2005, revealed "artifacts generated by [the] metallic screw in the distal tibia . . . . [There were] some irregularities of the distal fibula which seem[ed] to be due to previous surgery and insertion of screws which were later removed. There [was] no definite tendon or ligamentus injury." (R. at 252.) The test noted "some irregularity of the distal fibula and tibia probably due to [an] old fracture and postop changes." (R. at 253.)

The record also shows that Ms. Anderson suffers from vertigo. Ms. Anderson's treating physician completed a Vestibular Disorder Residual Functional Capacity Questionnaire, indicating that Ms. Anderson suffers attacks of balance disturbance approximately once per day, and lasting for fifteen to thirty minutes. (R. at 179.) These attacks incapacitate Ms. Anderson, during which time she could not perform "any activities of daily living," and they occurred without an identifiable stimulus and in an unpredictable manner. (Id.) The treating physician opined that these attacks would "interfere with the ability [of Ms. Anderson] to maintain reliable attendance in a work schedule[.]" (Id.)

## 2. Mental Impairments

The record shows that Ms. Anderson suffers from a pain disorder and a mood disorder. On January 28, 2006, Alan Long, a

16

licensed clinical psychologist, having been referred by the
Bureau of Disability Determination Services, evaluated Ms.
Anderson. (R. at 301.) He noted that, in a report from Dr.
Jeremy Tucker of South Suburban Hospital dated September 27,
2004, Ms. Anderson had a past medical history including
depression.[2] (R. at 301.) The psychologist diagnosed Ms.
Anderson with a Pain Disorder, with both Psychological Factors
and General Medical Condition, citing 307.89-DSM-IV. (R. at
302.) He also indicated that Ms. Anderson had a Mood Disorder
Due to General Medical Condition, citing 293.83.-DSM-IV. (Id.)
The psychologist indicated that Ms. Anderson could "manage her
own funds" and had "excellent work related abilities[,] but her
health condition and psychological status seem[ed] to prevent her
seeking employment." (R. at 303.)

Dr. Delossantos, Ms. Anderson's treating physician,
completed a Medical Source Statement (Mental) on September 15,
2007, indicating that Ms. Anderson's "ability to understand,
remember, and carry out instructions" was affected by her
impairment and her "ability to respond appropriately to
supervision, co-workers, and work pressures in a work setting
[was] affected by the impairment." (R. at 180-81.) The treating

---

[2] The report from Dr. Tucker also indicated that Ms. Anderson's past
medical history included post traumatic arthritis of the right ankle,
hypertension, and GERD. (R. at 301.)

17

physician also indicated that Ms. Anderson displayed "signs of depression [and] frequent attacks of anxiety." (R. at 181.)

## SOCIAL SECURITY REGULATIONS

When an individual claims a need for DIB or SSI, she must prove the existence of a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## THE ALJ'S DECISION

In her decision of March 6, 2008, the ALJ found that Ms. Anderson suffered from depression, a mood disorder, status post

ankle fracture with open reduction internal fixation (ORIF),
dizziness, and headaches. (R. at 52.) The ALJ determined that
none of these impairments, individually or in combination, met or
medically equaled one of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (10 CFR 404.1520(d), 404.1525, and
404.1526). (*Id.*)

The ALJ applied the five step sequential analysis outlined
above to make her final decision. At step one she determined
that Ms. Anderson had not engaged in any substantial gainful
activity since the alleged onset date of September 21, 2004. (R.
at 52.) At step two, the ALJ determined that Ms. Anderson had
severe impairments; specifically, she found that Ms. Anderson
suffered from "depression, mood disorder, status post ankle
fracture with open reduction internal fixation (ORIF), dizziness,
and headaches." (*Id.*) At step three, the ALJ determined that
Ms. Anderson did not have an impairment or combination of
impairments that met or medically equaled one of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)
At step four, the ALJ determined that Ms. Anderson had the RFC to
lift and carry 20 pounds occasionally and 10 pounds frequently,
sit for 6 hours in an 8-hour workday, and stand or walk for 6
hours in an 8-hour workday, could occasionally climb ladders,
ropes and scaffolds, and mentally was capable of performing

19

unskilled, simple, repetitive routine tasks with occasional interaction with the general public, supervisors, and coworkers with low stress and no strict production quotas. (R. at 52-53.) Based upon this RFC, the ALJ determined that Ms. Anderson was unable to perform any of her past relevant work. (R. at 55.) At step five, the ALJ determined that, considering Ms. Anderson's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Ms. Anderson could perform. (R. at 56.) Accordingly, the ALJ determined that Ms. Anderson was not disabled as defined by the Social Security Act from September 1, 2004, through the date of the ALJ's decision. (R. at 57.)

## STANDARD OF REVIEW

An ALJ's decision should be affirmed by the reviewing district court if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The Court cannot substitute its own judgment for that of the ALJ by reevaluating the facts or reweighing the evidence to determine if the claimant is in fact disabled. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). Should there be

conflicting evidence that would permit reasonable minds to differ, it is the responsibility of the ALJ, not the courts, to determine if the claimant is disabled. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

The ALJ is not required to address all the evidence in the record, but she must articulate her analysis in a manner that permits understanding of how the evidence supports her conclusion, so that the Court may conduct a meaningful review of the SSA's ultimate findings on behalf of the claimant. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). If the ALJ fails to rationally articulate the grounds for her decision in a manner that permits meaningful review, the Court must remand. *Id.* "Thus, the issue before this court is not whether [the claimant] is disabled, but rather, whether the ALJ's findings were supported by substantial evidence." *Diaz*, 55 F.3d at 306.

## DISCUSSION

Ms. Anderson makes three arguments in support of her motion for summary judgment: (1) the ALJ improperly made her own medical findings; (2) the ALJ failed to consider properly Ms. Anderson's credibility; and (3) the ALJ failed to consider the entire record, particularly the evidence that was favorable to Ms. Anderson. Each of these arguments is considered in turn.

## 1. The ALJ's Medical Findings.

Ms. Anderson first argues that the ALJ improperly rejected the opinion of the treating physician that her "ability to understand, remember, and carry out instructions" was affected by her impairment and that her "ability to respond appropriately to supervision, co-workers, and work pressures in a work setting [was] affected by the impairment." (R. at 180-81.) Ms. Anderson contends that the treating physician's opinion was supported by medical evidence and was not inconsistent with other substantial evidence in the record and was, therefore, entitled to controlling weight. The Commissioner contends that the ALJ did not improperly reject the opinion of the treating physician.

An ALJ is not permitted to substitute her own judgment for that of a physician and must rely on other medical evidence or authority in the record. *Clifford*, 227 F.3d at 870. "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Additionally, "more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

As discussed above, at step two of the sequential analysis outlined above, the ALJ determined that Ms. Anderson had severe

22

impairments; specifically, the ALJ found that Ms. Anderson suffered from "depression, mood disorder, status post ankle fracture with open reduction internal fixation (ORIF), dizziness, and headaches." (R. at 52.) At step three, the ALJ determined that Ms. Anderson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ indicated that, in so finding, she was "according great weight" to the testimony of the ME. (*Id.*) The ALJ indicated that the ME "had reviewed the entire medical and psychological evidence of record as well as testimony of the claimant presented at trial" in making his determination. (*Id.*)

Here, the ALJ accorded great weight to the opinion of the ME. "Medical evidence may be discounted if it is . . . inconsistent with other evidence" in the record. *Knight*, 55 F.3d at 314. The ALJ noted that the ME's opinion was supported by the findings of the psychiatrist and the state agency psychologists, while the treating physician's opinion regarding Ms. Anderson's impairments was not supported by evidence in the record and "appear[ed] to be outside of his expertise." (R. at 55.) The psychological evaluation conducted by Dr. Alan Long, Ph.D., indicated that Ms. Anderson was diagnosed with a "pain disorder associated with both psychological factors and general medical

condition" and "a mood disorder due to general medical condition." (R. at 54.) The ALJ specifically stated that, in order to address the various medical opinions regarding Ms. Anderson's mental impairments, she relied "upon a medical expert who specializes in psychological disorders for his professional assessment and opinion regarding the severity of claimant's impairments." (R. at 55.) The ALJ therefore relied upon the ME's opinion, which was based on the "entire medical and psychological evidence of record, including the new evidence" submitted after the hearing before the ALJ. (Id.) Based on all that evidence, the ME concluded that Ms. Anderson "retains the mental capacity to understand and remember short instructions on a consistent basis with occasional contact with the general public and supervisors with no strict quotas or stress levels that are high." (Id.) The ALJ further noted that the treating physician apparently based his assessment that Ms. Anderson had "poor" abilities in all the areas on the fact that Ms. Anderson "could not handle any kind of stress and that she gets upset for no reason." (R. at 55.)

The ALJ reached her determination by "according great weight" to the testimony of the ME, who "had reviewed the entire medical and psychological evidence of record as well as testimony of the claimant presented at trial" in making his determination.

24

(R. at 52.)  The ME noted that, in "the testimony [before the
ALJ, Ms. Anderson] was able to give a very detailed account of
her personal history [and] of her medical history."  (R. at 34.)
Substantial evidence of record supported the ME's opinion,
including the opinions of a psychiatrist and the state agency
psychologists.  (R. at 55.)  Based on the ME's opinion, supported
by substantial evidence of record, the ALJ determined that Ms.
Anderson did not have an impairment or combination of impairments
that met or medically equaled one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1.  Where the opinion of the
treating physician did not agree with the other substantial
evidence in the record, the ALJ did not improperly make her own
medical findings, but instead based her decision on the
substantial evidence in the record, which all was in accord
except for the sole contrary opinion of the treating physician.
This was proper and within the ALJ's capacity to decide, and
therefore this determination was not improper.

## 2.    The ALJ's Credibility Determination

Ms. Anderson next argues that the ALJ improperly rejected
her testimony as being less than fully credible.  Ms. Anderson
argues that the ALJ should have accepted her testimony regarding
the intensity of her alleged symptoms, because the treating
physician indicated that those symptoms would affect her "ability

to understand, remember, and carry out instructions" and her
"ability to respond appropriately to supervision, co-workers, and
work pressures in a work setting [was] affected by the
impairment." (R. at 180-81.) The Commissioner argues that the
ALJ expressly addressed the credibility of Ms. Anderson's
statements and determined that Ms. Anderson's testimony was
inconsistent with the objective medical evidence of record.

In order to determine the extent of a claimant's disability,
the ALJ "must consider the physical abilities, mental impairments
and any other impairments." *Cass*, 8 F.3d at 555 and 20 C.F.R. §§
404.1545; 416.945. The ALJ's determination of the claimant's
credibility is entitled to substantial deference and is only
disturbed if patently wrong. *Diaz*, 55 F.3d at 308. If the ALJ's
credibility finding and RFC finding are well supported and
adequately articulated, they must be affirmed. *Kelley*, 890 F.2d
at 964. "While the law requires the ALJ to weigh all credible
evidence and make unbiased factual findings, it does not compel
an ALJ to accept wholly the claimant's perception of a
disability." *Cass*, 8 F.3d at 555. "[T]he ALJ's determination or
decision regarding claimant credibility 'must contain specific
reasons for the finding on credibility, supported by the evidence
in the case record, and must be sufficiently specific to make
clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individuals statements and the reasons for that weight'." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001), *quoting* Social Security Ruling 96-7p. A claimant's contrary opinion regarding her own disability does not invalidate the substantial evidence provided by medical experts that support the decision of the ALJ. *Id.* "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the . . . court to trace the path of his reasoning. An ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required." *Diaz*, 55 F.3d at 308, *citations omitted.*

Before the ALJ, Ms. Anderson testified that she did not attend her children's school events or functions with family or friends, did not have hobbies, did not do gardening or yard work, did not read, had trouble following television programs' plots, could not stand or walk at all during the eight-hour workday, did not care for her children, rarely drove a car, and did not perform household chores, wash laundry, cook, make the beds, or take out the garbage. (Tr. 17-19 and R. 24-25.) Ms. Anderson also testified that she slept for approximately two hours each day, and lay down for another two hours each day. (R. at 26.) Ms. Anderson testified that, at her most recent employment, she

27

was supposed to work part-time for 20 hours a week, but that her
health prevented her from working the full 20 hours; she also
testified that she had never held a job where she had to lift ten
or more pounds. (R. at 17, 21, and 37-38.)

The ALJ determined that, mentally, Ms. Anderson retained the
RFC to perform unskilled, simple, repetitive routine tasks with
occasional interaction with the general public, supervisors, and
coworkers with low stress and no strict production quotas. The
ALJ found that

> [Ms. Anderson's] medically determinable
> impairments could reasonably be expected to
> produce the alleged symptoms; however, the
> claimant's statements concerning the
> intensity, persistence and limiting effects
> of these symptoms are not credible to the
> extent they are inconsistent with the
> residual functional capacity assessment . . .
> . While the claimant undoubtedly may
> experience some pain, limitations, and
> restrictions from her impairments, and some
> side effects (drowsiness) from certain
> medications, the extent, and frequency
> reported is not fully credible and not
> supported by the objective medical evidence
> of record . . . .

(R. at 53.) The ALJ determined that the medical evidence of
record and the testimony of the ME did not support Ms. Anderson's
complaints.

In making this determination, the ALJ looked to both the
testimony of Ms. Anderson and the medical findings of the various

doctors and the evidence of record. Ms. Anderson testified that she suffered from problems affecting her memory and concentration, making it difficult to "remember just little things." (R. at 17.) However, the ME noted that, in "the testimony [before the ALJ, Ms. Anderson] was able to give a very detailed account of her personal history [and] of her medical history." (R. at 34.) The ME specifically stated that, in his opinion, Ms. Anderson displayed "very little" evidence of a memory impairment and that the medical evidence of record indicated there was no "disturbance in thought processes." (R. at 33-34.) The ME further stated, "the mental status [of Ms. Anderson] was essentially intact with [her] able to do calculations; [her] concentration presented as intact in mental capacity testing." (R. at 34.) Responding to questions presented to her, Ms. Anderson was able to provide the date she last worked, the dates related to her disability application, and specific details regarding her medical history, including dates and diagnoses. (R. at 17-23.)

There is evidence that the ALJ did consider the opinion of the treating physician and Ms. Anderson's own statements concerning her abilities and impairments. The ALJ indicated that, because Ms. Anderson's testimony regarding "the intensity, persistence, or functionally limiting effects of pain or other

symptoms are not substantiated by objective medical evidence,"
she had to "make a finding on the credibility of [Ms. Anderson's]
statements based on a consideration of the entire case record."
(R. at 53.) The ALJ determined that "the extent, and frequency
reported [by Ms. Anderson] is not fully credible and not
supported by the objective medical evidence of record . . . ."
(*Id.*) To support this determination, the ALJ reviewed the
contents of the extensive medical evidence of record, including
treatment notes from Family Health Society, South Suburban
Hospital, St. James Hospital, the psychological evaluation
conducted by Dr. Alan Long, the conclusions by the state agency
physicians, and the evidence submitted by Ms. Anderson after the
ALJ hearing. (R. at 54.) The ALJ also noted that, for her
physical impairments, Ms. Anderson was recommended to submit to a
"range of motion exercises with physical therapy with cervical
traction and cranial sacral message [*sic*] as needed for her
headaches." (R. at 55.) The ALJ also indicated that, regarding
Ms. Anderson's depression and mood disorder, the psychiatrist
stated that Ms. Anderson "was able to perform the daily
activities, able to perform her present interests, and was able
to communicate with family members, neighbors, and friends."
(*Id.*) Finally, the ALJ did acknowledge that Ms. Anderson's
treating physician, a family physician, "opined that [Ms.

30

Anderson] has 'poor' abilities [and was] unable to handle any kind of stress." (*Id.*)

The ALJ acknowledged that there was contradictory medical evidence regarding Ms. Anderson's impairments. Dr. Pradeep Thapar, who completed the psychiatric report on May 19, 2006, indicated that Ms. Anderson "was able to perform the daily activities, able to perform her present interest, and was able to communicate with family members, neighbors, and friends." (R. at 54-55.) The state agency psychologists stated that Ms. Anderson had "the mental capacity to perform simple work related tasks . . . ." (R. at 55.) The treating physician, however, opined that Ms. Anderson was "unable to handle any kind of stress" and had "poor" abilities. (*Id.*) Rather than attempt to determine which opinion to credit, the ALJ instead decided to "accord great weight" to the ME, "who specializes in psychological disorders." (*Id.*) The ALJ relied on the opinion of the ME, who based his opinion on a "review of the entire medical and psychological evidence of record, including new evidence submitted by counsel [after the ALJ hearing], as well as testimony of [Ms. Anderson] presented at hearing . . . ." (*Id.*) Based on this review, the ME determined that Ms. Anderson "retains the mental capacity to understand and remember short instructions on a consistent basis

with occasional contact with the general public and supervisors
with no strict quotas or stress levels that are high." (*Id.*)

Based on the evidence of record, the ALJ determined that Ms.
Anderson's testimony regarding her symptoms was not credible. As
discussed above, the ALJ properly rejected the medical opinion of
the treating physician, which was not supported by the evidence
of record and which contradicted the medical evidence presented
by other doctors. The ALJ followed the determination made by the
ME, who reviewed all the evidence of record, including the
evidence from the treating physician submitted after the ALJ
hearing. By providing a review of all evidence of record and
indicating that she was relying upon the opinion of the ME, the
ALJ clearly provided a specific reason for her credibility
findings and a clear indication of what statements were accorded
weight. *Zurawski*, 245 F.3d at 887. There is no evidence in the
record to suggest that this determination is patently wrong, and
the Court must, therefore, give it substantial deference. *Diaz*,
55 F.3d at 308. Because it is possible to "track the ALJ's
reasoning and be assured that the ALJ considered the important
evidence," *Diaz*, 55 F.3d at 308, *citing Green v. Shalala*, 51 F.3d
96, 101 (7th Cir. 1995), the ALJ has met the minimum articulation
standard necessary to affirm her decision. Because the ALJ's
determination is rationally articulated and meaningful review of

that determination is possible in regards to the evidence of record, this Court must uphold the ALJ's determination that Ms. Anderson's testimony regarding the intensity and persistence of her ailments was not credible.

### 3. The ALJ's Consideration of the Record

Ms. Anderson next argues that the ALJ failed to consider the entire record and ignored the evidence in the record that was favorable to her, especially testimony by the VE. The Commissioner argues that the ALJ did credit the VE testimony in response to hypotheticals that included restrictions supported by the record as a whole.

An ALJ's decision should be affirmed by the reviewing district court if it is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele*, 290 F.3d at 940. The ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176. The substantial evidence standard is "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Rather, the standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court cannot substitute its own judgment for that of the ALJ by reevaluating the facts or reweighing the evidence to determine if the claimant is in fact disabled. *Cass*, 8 F.3d at 555. Should

33

there be conflicting evidence that would permit reasonable minds to differ, it is the responsibility of the ALJ, not the courts, to determine if the claimant is disabled. *Herr*, 912 F.2d at 181.

As discussed above, at step five of the sequential analysis outlined above, the ALJ determined that Ms. Anderson was capable of performing work in the national economy. (R. at 56.) The VE testified that an individual situated similarly to Ms. Anderson could perform an occupation such as cleaner/housekeeper and that there were 10,800 such jobs in the national economy. (*Id.*) Case law supports that this number qualifies as a significant number of jobs. *See Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (1,400 jobs are a significant number), *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs are a significant number), and *Barker v. Secretary of Health & Human Services*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs are a significant number). Based on this testimony, the ALJ determined that Ms. Anderson had "been capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and a "not disabled" finding was appropriate. (R. at 56-57.) Therefore, the ALJ determined that Ms. Anderson was not disabled as defined by the Social Security Act from September 21, 2004, through the date of the ALJ's decision. (R. at 57.)

The ALJ did not consider the VE's testimony given in response to Ms. Anderson's attorney, where the VE stated that there were no cleaner/housekeeper positions in the national economy for a person who could not stand or walk for at least two hours in an eight-hour workday. (R. at 41.) The ALJ also did not consider the VE's testimony in response to Ms. Anderson's attorney, where the VE stated that there were no positions for a person who required a nap for two hours during each work day or was decommissioned one day each week due to migraines. (R. at 41-42.) Additionally, the ALJ did not consider the VE's testimony in response to Ms. Anderson's attorney, where the VE stated that a person would have to be on task at least 80 percent of the time to be employable and that a person who misses in excess of two days per month would find her job to be in jeopardy. (R. at 42-43.) These hypotheticals were purportedly based on the impact and the ramifications Ms. Anderson's alleged impairments had on her daily life, as evidenced exclusively by Ms. Anderson's testimony. But, as discussed above, the ALJ properly determined that Ms. Anderson's testimony concerning the severity and impact of her impairments was not fully credible. Accordingly, the ALJ chose not to credit that testimony, making the VE's testimony in response to the hypotheticals laregly irrelevant.

The ALJ relied on the VE's testimony to determine that Ms. Anderson was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy [and a] finding of 'not disabled' is therefore appropriate . . . ." (R. at 56-57.) The ALJ did not discuss the VE's testimony in response to Ms. Anderson's attorney's hypotheticals. However, as discussed above, the framework of these hypotheticals was based on the testimony of Ms. Anderson concerning the intensity of her impairments, which the ALJ appropriately found to not be credible. The ALJ's decision is supported by substantial evidence and is free from legal error. The evidence supporting the ALJ's decision exceeds the minimum requirement of being "more than a mere scintilla," as the entire evidence of record supports the ALJ's decision with the exception of the medical opinion of the treating physician and portions of Ms. Anderson's testimony, both of which were appropriately disregarded by the ALJ, as discussed above. Therefore, the Court finds that the ALJ did not inappropriately fail to consider the entire record.

## CONCLUSION

For the reasons explained above, the Court finds that the ALJ's decision below was based upon an appropriate and careful consideration of the evidence in the record. The ALJ articulated her determination of how to weigh conflicting medical testimony,

and incorporated her impressions of Ms. Anderson's hearing testimony. Additionally, the Court finds that the ALJ built an accurate and logical bridge between the record and her conclusion that Ms. Anderson was not disabled. The ALJ fully reconciled Ms. Anderson's complaints and the medical evidence of record with her determination that Ms. Anderson was not disabled. The record provides substantial evidence to support the ALJ's findings, and the ALJ's decision provides an accurate and logical explanation of how she considered the evidence to reach her ultimate determination. Accordingly, the Court denies Ms. Anderson's Motion for Summary Judgment, and affirms the Commissioner's decision denying benefits. In light of this ruling, Ms. Anderson's request for attorney's fees is denied.

Dated: July 28, 2009

ENTER:

ARLANDER KEYS
United States Magistrate Judge

37